**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JANECIA IVY, | |
| Plaintiff, | No. 24 CV 6028 |
| v. | Judge Georgia N. Alexakis |
| AMAZON.COM SERVICES, LLC, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Janecia Ivy began working for defendant Amazon.com Services, LLC in October 2023, when she was seven months pregnant. In mid-November, she left on prepartum leave, which was continued to postpartum leave when her son was born on December 1. When the original term of her maternity leave was about to lapse ten weeks after her delivery, on February 8, 2024, Ivy requested a two-week extension. Amazon requested medical documentation supporting the extension, and when Ivy did not provide it after two weeks, Amazon denied her extension request. Ivy did not return to work. A few days later, Amazon terminated her.

Ivy sued Amazon under Title VII and the Pregnant Worker Fairness Act ("PWFA"), claiming that Amazon discriminated against her, subjected her to harassment, failed to accommodate her condition arising from pregnancy or childbirth, and retaliated against her for requesting and taking leave to recover from childbirth. Amazon has moved for summary judgment. [49]. For the reasons given below, its motion is granted in part and denied in part.

## I. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II. Background

The following facts are taken from the parties' Local Rule 56.1 Statements of Material Fact, responses thereto, and exhibits submitted in support thereof. [50], [57], [61], [65]. These facts are undisputed unless otherwise noted.

Janecia Ivy began working as a Warehouse Associate at Amazon on October 20, 2023.[1] [50] ¶ 4; [57] ¶ 4. Ivy was pregnant at the time, with an estimated due date of December 3. [50] ¶ 28; [57] ¶ 28. Amazon offers pre- and postpartum leave for new

---

[1] This was not Ivy's first job with Amazon; she had worked at Amazon for three separate brief stints prior, between September 2021 and January 2023. [50] ¶ 1.

parents, and Ivy took advantage of this program. [50] ¶¶ 16, 26–34; [57] ¶¶ 16, 26–34.[2] She began prepartum leave on November 13, 2023. [50] ¶ 30; [57] ¶ 30.

On December 1, 2023, Ivy gave birth to her son. [50] ¶ 32; [57] ¶ 32. On December 6, an Amazon representative contacted Ivy to request confirmation of the baby's delivery and birth date since the due date had passed, which Ivy provided. [50] ¶ 32; [57] ¶ 32. The Amazon representative congratulated Ivy and then transitioned her to postpartum leave for a period of ten weeks starting on her son's date of birth. [50] ¶¶ 33–34; [57] ¶ 33–34. Her postpartum leave was set to expire on February 8, 2024. [50] ¶ 34; [57] ¶ 34.

Around the time of her scheduled return to work, Ivy requested an extension of leave through February 22 via Amazon's human resources portal. [50] ¶ 38; [57] ¶ 38. Her extension request identified the reason for her leave as "Pregnancy/Childbirth." [61-4] at 2. Shortly thereafter, an Amazon representative spoke to Ivy by phone about her extension request. [50] ¶ 39; [57] ¶ 39. The representative documented the call with a note alleging that she had explained to Ivy

---

[2] At several points in her response to Amazon's statement of material facts, Ivy responds by admitting in part and disputing in part the asserted facts. Upon closer examination of Ivy's responses, however, the dispute she identifies is not to the specific facts asserted by Amazon but rather to implications that could be drawn from those facts, particularly in light of additional facts that Ivy asserts. *See, e.g.*, [57] ¶¶ 16, 30, 34, 39, 45, 46, 47, 61. These responses from Ivy are improper because they set forth new facts that are not "fairly responsive to the asserted fact" and assert legal arguments that are not objections based on, for example, admissibility, materiality, or absence of evidentiary support. *See* N.D. Ill. L.R. 56.1(e)(2). Rather than dispute the asserted fact in part, the proper course of action would have been for Ivy to assert additional facts in her statement of additional material facts, *see* N.D. Ill. L.R. 56.1(b)(3), and use her accompanying memorandum to advance arguments based on those facts. Where Ivy has taken the improper approach described above, the Court treats a properly supported fact asserted by Amazon as admitted. Where Amazon has taken the same improper approach, *see, e.g.*, [65] ¶ 14, the Court applies the same treatment.

that she had exhausted her paid postpartum leave and if she needed additional time off to care for her son, the "only option would be unpaid PLOA [personal leave of absence] for minimum of 15 calendar days." [50] ¶ 39; [57] ¶ 39; [50-26].

On February 12, 2024, Amazon's Disability and Leave Services ("DLS") emailed Ivy to let her know that her leave extension request would be processed as a request for short-term disability leave because she had exhausted her postpartum leave, and that Amazon required documentation from a health care provider stating that Ivy had a "serious health condition" and providing medical information about her condition and treatment plan. [50] ¶ 40; [57] ¶ 40; [50-27] at 4. Amazon sent the same email on February 22. [50] ¶ 41; [57] ¶ 41; [50-28]. Both emails contained two conflicting deadlines: February 27 and March 13. [50] ¶ 42; [57] ¶¶ 40–41; [50-27]; [50-28]. Amazon's intended deadline was February 27, which was the date included in its internal systems. [50] ¶¶ 40–42, 44; [57] ¶ 44. That deadline also aligns with Amazon's typical practice of setting a fifteen-day due date for documentation when employees request a leave extension. [50] ¶ 18; [57] ¶¶ 16–18; [50-10] at 36:8–24.

At her deposition, Ivy testified that she was advised that her failure to return the required documentation by February 27 would result in her leave being delayed or denied. [50-5] at 92:1–5, 94:9–13. She did not testify that she had relied upon or was aware of the March 13 date or mention confusion based on conflicting due dates.[3]
*Id.*

---

[3] Ivy later signed a declaration stating that she was confused about the conflicting deadlines in Amazon's emails. [61-6] ¶ 8. For reasons discussed below, the Court does not credit that statement.

4

On February 26, one day before the deadline, DLS called Ivy and left a voicemail reminding her to upload the required documentation. [50] ¶ 45; [57] ¶ 45. Ivy then uploaded the same documentation she had sent to support her original pre- and postpartum leave: an ultrasound and proof of delivery. [50] ¶ 46; [57] ¶ 46. On February 29, DLS informed Ivy that her request for an extension of her leave was denied because she did not provide sufficient documentation. [50] ¶ 47; [57] ¶ 47.

Amazon employees can accrue unpaid time ("UPT") credits to account for unexpected absences. [50] ¶ 20; [57] ¶ 20. When an employee's UPT balance becomes negative, she is in violation of Amazon's attendance policy, which is grounds for termination. [50] ¶ 21; [57] ¶ 21. When Ivy did not return to work on February 28— after the February 27 deadline had elapsed—the UPT she had accrued began to deplete. [50] ¶ 50; [57] ¶ 50. Once Ivy's UPT balance fell below zero, Amazon's human resources representative Cynthia Hines called and emailed Ivy to let her know that the requested documentation was still missing and Ivy needed to upload it in order for her extension to be approved. [50] ¶¶ 56–57; [57] ¶¶ 56–57. Ivy told Hines during that call that she needed additional time off due to her postpartum "high-risk" condition, but she did not upload any supporting documentation.[4] [50] ¶ 58; [57] ¶ 58; [61] ¶¶ 15–16.

Hines had discretion to credit additional UPT to employees' accounts and did so for certain other employees who presented explanations such as childcare or

---

[4] Ivy signed a declaration stating that she told Hines her reason for needing additional time was for her high-risk condition related to her childbirth and for no other reason. [61-6] ¶¶ 5– 6. For the reasons stated below, the Court credits that piece of her declaration.

transportation issues, including Ivy's boyfriend Kamorie Anderson (also an Amazon employee at the time) and one of Anderson's friends, Chucky. [61] ¶¶ 14, 25–26; [65] ¶¶ 14, 25–26. However, Hines did not credit UPT to Ivy. [61] ¶ 14; [67] ¶ 14.

Hines terminated Ivy, effective March 2, citing Ivy's negative UPT balance as the reason for the termination. [50] ¶¶ 61–62; [57] ¶¶ 61–62. Later in March, Hines allegedly told Anderson "in substance that she had terminated Ms. Ivy because she thought Ms. Ivy was just there for the maternity benefits and was going to leave afterward." [61-7] ¶ 7.

During her time at Amazon, Ivy did not complain of discrimination or harassment. [50] ¶ 76; [57] ¶ 76. With leave from the EEOC, Ivy filed suit in July 2024, alleging sex-based discrimination, harassment, and retaliation under Title VII, and failure to accommodate and retaliation under the Pregnant Workers Fairness Act. [1].

## II. Analysis

### A. Ivy's Declaration

After Amazon filed its motion for summary judgment, Ivy signed a declaration including the following statement: "At the time I was fired by Amazon, I was confused because I thought I had additional time to provide the requested documents based on email correspondence stating the deadline was March 13, 2024." [61-6] ¶ 8. This assertion conflicts with Ivy's deposition testimony that she was advised of the February 27 deadline to submit documentation supporting an extended leave. [50-5] at 92:1–5, 94:9–13. Indeed, at no point during her deposition did Ivy mention the

March 13 deadline or even the existence of a different deadline other than the February 27 deadline. *See generally* [50-5].

While the Court construes all facts in the light most favorable to the nonmoving party at the summary judgment stage, "a plaintiff cannot manufacture a genuine dispute of material fact by contradicting her prior deposition testimony with an affidavit." *Leibas v. Dart*, 108 F.4th 1021, 1026 (7th Cir. 2024). Thus, the Court "is well within its discretion to strike an affidavit that contradicts deposition testimony unless the affiant has offered a plausible explanation for the discrepancy." *Donaldson v. Johnson & Johnson,* 37 F.4th 400, 406 (7th Cir. 2022). Ivy has offered no credible explanation for the discrepancy. In one instance, she asserts that in her deposition, she testified that she "did not recall" whether the documentation was due on February 27, *see* [57] ¶ 43, a statement that—if true—could reconcile Ivy's deposition testimony and declaration. But in the cited portion of her deposition testimony, Ivy actually testified that she "did not recall" whether she had an email requesting documentation by February 27 and "[did not] remember" whether she had "any reason to dispute that [Hines] told [Ivy] that all the documentation for [her] extension request would be due February 27th, 2024." *See id.*; [50-5] at 88:5–15. She did not testify that she could not recall the operative deadline.

"When a witness abandons her testimony in the face of a pending summary judgment motion, the change is often a transparent ruse designed to prolong the case; allowing the ruse to succeed would defeat summary judgment's purpose of weeding out clearly unmeritorious cases." *Patton v. MFS/Sun Life Fin. Distributors, Inc.*, 480

F.3d 478, 488 (7th Cir. 2007). This is especially true when "the witness has consistently adhered to one version of events prior to the change," as is the case here. *Id.* If Ivy's theory of the case is that she failed to upload supporting documentation by February 27 because she was relying on a March 13 deadline, it stretches credulity that she would not have made that allegation in her complaint, her response to Amazon's interrogatory, or her deposition. *See generally* [1]; [50-36]; [50-5]. The Court therefore disregards Ivy's declaration to the extent it seeks to establish that Ivy was confused about whether February 27 or March 13 was Amazon's operative deadline for submitting documentation justifying additional leave. Although there is no dispute in the record that both dates appeared in relevant email correspondence to Ivy, *see, e.g.*, [50] ¶ 42, there is also nothing in the record reflecting that Ivy believed she had until March 13 to submit the required documentation.

However, in the case the affidavit addresses "ambiguous or incomplete earlier testimony," the conflict between affidavit and testimony poses a credibility issue for a jury. *Greene v. Illinois Sec'y of State*, 813 F. Supp. 3d 861, 873 (N.D. Ill. 2025) (quoting *Patton*, 480 F.3d at 488). Such is the case with respect to another assertion in Ivy's declaration: that she told Hines she needed additional leave due to her "post-partum high-risk condition following birth," and not for any unrelated reason. [61-6] ¶¶ 5–6. In her deposition, Ivy's testimony about her reason for needing an extension of leave is unclear: she testified "[w]hen I had my son, the doctors told me I was high risk. They told me to keep an eye on him, and I had to do an update with him." [50-5] at 66:20–67:5. This statement seems to allude to the medical fragility of both Ivy and

8

her son, so Ivy's declaration clarifies that her sole reason for taking leave was her own health. The Court therefore credits Ivy's declaration with respect to the reason that she needed additional time off before coming back to work.

### B. Title VII Discrimination (Count I)

Title VII prohibits employers from discriminating against employees on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). Congress amended Title VII through the Pregnancy Discrimination Act, which clarified that sex discrimination encompasses discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Ivy's claim of Title VII discrimination can survive summary judgment if the record, construed in the light most favorable to her, allowed a reasonable trier of fact to find that Amazon discriminated against Ivy due to her sex or because she was pregnant. The Court finds that it does not.

A discrimination claim survives a motion for summary judgment when "the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Seventh Circuit instructs district courts to consider the evidence as a whole, rather than sorting it into buckets of "direct" and "indirect" evidence. *Id.* Evidence presented within the burden-shifting analysis established by *McDonnell– Douglas Corp. v. Green*, 411 U.S. 792 (1973), can clarify the plaintiff's argument, but ultimately is still considered as part of a whole body of evidence. *Id.*; *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020).

Here, both parties utilize the *McDonnell-Douglas* framework to advance their respective positions, *see* [51] at [5–9], [60] at [4–8], and Ivy also pays particular attention to a statement made by Hines, the human resources representative who terminated her, *see* [60] at [5–6]. The Court analyzes Ivy's Title VII discrimination claim in kind.

### 1.   *McDonnell-Douglas* Framework

To establish discrimination under the *McDonnell-Douglas* framework, Ivy must present evidence showing "that (1) she was a member of a protected class, (2) she performed reasonably on the job in line with the employer's legitimate expectations, (3) she was subjected to an adverse employment action, and (4) similarly situated employees of the opposite sex were treated more favorably." *Lauderdale v. Illinois Dep't of Hum. Servs.*, 876 F.3d 904, 910 (7th Cir. 2017) (numerals added). She must also show that the nondiscriminatory basis for termination that Amazon presents is pretext for illegal discrimination. *Id.*; *Upchurch v. Indiana*, 146 F.4th 579, 587 (7th Cir. 2025).

Amazon does not dispute that Ivy belonged to a protected class as a woman or that she suffered an adverse employment action when she was terminated. [51] at 6. The factors of whether her work performance met Amazon's expectations and whether she was treated more harshly than her peers intertwine. Amazon argues that Ivy did not meet its expectations when she failed to return to work following maternity leave. Attendance is part of an employer's reasonable performance expectations. *See Huang v. Cont'l Cas. Co.*, 754 F.3d 447, 450–51 (7th Cir. 2014) ("[E]mployers are entitled to determine their scheduling needs and decide whether

10

employees are satisfying them.") (internal citation omitted). To that point, Ivy argues that Amazon's enforcement of its attendance policy against her was discriminatory because her peers who ran down their UPT balances received discretionary UPT credits from Hines to keep them in the black. [60] at 5.

Still, Ivy has not provided evidence of a similarly situated comparator who did not experience the adverse treatment she suffered. She alleges that Hines offered UPT credit to her boyfriend Anderson and his friend Chucky. The record—namely, Anderson's declaration—indicates that Hines credited Anderson's and Chucky's UPT here and there over a period of multiple months rather than excusing multiple days' worth of absences at one time.[5] [61-7] ¶¶ 9–11. It also indicates that the absences Hines credited were due to unforeseeable short-term emergencies such as car trouble and childcare issues, not medium- or long-term health issues necessitating weeks of absence. [61] ¶ 14. To fulfill the fourth element of her *McDonnell* argument, Ivy had to find a nonpregnant and/or male coworker who amassed a UPT deficit when he failed to return to work after a period of leave and was not fired. *Huang*, 754 F.3d at 451 (a plaintiff who was terminated for refusing to work on weekends was not similarly situated to one coworker who was permitted to arrive and leave two hours early on certain weekdays or another coworker who was not terminated for

---

[5] It is not clear how or whether Anderson has personal knowledge that Hines credited Chucky's UPT, as Federal Rule of Civil Procedure 56(c)(4) requires. If Anderson's knowledge is based on a representation made by Chucky, it would be hearsay. However, Amazon does not object to consideration of Anderson's declaration on those grounds. [64] at 6–7.

requesting to work from home). Ivy has not demonstrated that Anderson and Chucky are similarly situated.

Ivy also has not shown that the reason for her termination was pretextual. The record shows that, according to Amazon, Ivy was terminated due to her lack of attendance. Ivy argues that this reason was pretextual, setting forth the fact of Amazon's erroneous inclusion of a March 13 deadline in two of its emails requesting documentation evincing her continued health condition. [60] at 6–7. It is true, as Ivy argues, that shifting and inconsistent justifications for termination can point to pretext. *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 778 (7th Cir. 2013). But here, Ivy's UPT balance was undisputedly negative in violation of Amazon's attendance policy, and that is the single reason Amazon has consistently given for firing her. [50] ¶¶ 21, 55, 61–62. Although the inclusion of the March 13 date was a mistake, the error is not material to Amazon's reason for firing Ivy: her UPT balance was negative. *Mullin*, 732 F.3d at 778 ("A mere mistake by an employer does not constitute pretext; instead, pretext 'is a phony excuse.'") (quoting *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)). Hines testified that if she had known about the mistake, she would have honored the later date, [50-7] at 40:19–41:12; but that admission is an acknowledgement of the error, not evidence that the mistake was a sham covering for discrimination. *Id.* The reason Hines provided was consistent and in line with Amazon's policy. It bears no resemblance to a pretext.[6]

---

[6] Ivy also argues that Amazon's "failure to follow its own internal processes also supports a pretext inference," implying that Ivy's March 2, 2024, termination was premature because her "case" was still "open" on February 29, 2024, and because Hines did not verify Ivy's leave

12

### 2. Hines's Statement

The Court also considers Hines's statement to Anderson that "she terminated Ms. Ivy because she thought Ms. Ivy was just there for the maternity benefits and was going to leave afterward." [61-7] ¶ 7. It starts this analysis by discussing other Seventh Circuit cases dealing with similar fact patterns.

The Seventh Circuit has held that an employer terminating an employee right before the employee went on maternity leave because the employer did not expect her to return to work after her maternity leave was not discrimination—at least, when "standing alone." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737–38 (7th Cir. 1994). *Troupe* employs a hypothetical about a Black male employee scheduled to take a three-month sick leave for a kidney transplant. *Id.* at 738. If his employer fired him right before the transplant for the reason that it did not expect him to return after leave, *Troupe* concluded that this event would not be evidence of race-based discrimination without separate evidence that it treated white workers differently. *Id.* So, per *Troupe*, firing a woman around the time of her maternity leave because the company did not expect her to come back is not sex-based discrimination. *Id. See*

---

status before terminating her. [60] at 7–8. But to support this argument, Ivy cites Paragraph 10 of her statement of additional material facts. *Id.* (citing [61] ¶ 10). Paragraph 10, in turn, asserts only that Hines did not clarify the discrepancy between the February 27 and March 13 deadlines. [61] ¶ 10. The Court has already addressed this issue. To the extent Ivy intended to support her second argument by citing Paragraph 28 of her statement of additional material facts (Paragraph 28 appears more related to the argument advanced in Ivy's memorandum), Ivy's argument still fails. The Court has examined the record material Ivy cites to support Paragraph 28 and agrees with Amazon's assessment: "This paragraph … is not supported by the citations to the record." [65] ¶ 28. The Court therefore disregards the asserted facts in Paragraph 28 and any argument that relies on them. *See* N.D. Ill. L.R. 56.1(d)(2) ("The court may disregard any asserted fact that is not supported" with a "citation to the specific evidentiary material … that supports it").

*also id.* ("The Pregnancy Discrimination Act requires the employer to ignore an employee's pregnancy, but … not her absence from work, unless the employer overlooks the comparable absences of nonpregnant employees.").

Three years after *Troupe*, the Seventh Circuit affirmed a district court's grant of an employer's motion for summary judgment on a Pregnancy Discrimination Act claim, where the record contained evidence that the defendant-company's general counsel had made comments "to the effect that he was sure [plaintiff] would not return to work full-time after having her third child because [the general counsel's own] daughters were extremely busy with just two children, and that he thought it was better for mothers of young children to stay at home." *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1156 (7th Cir. 1997). When the plaintiff asked the general counsel if he would still lay her off if she miscarried tomorrow, he responded: "I don't know what I'd do in that situation. We'd have to reevaluate it then." *Id.* In affirming summary judgment, *Ilhardt* re-affirmed *Troupe's* conclusion that "statements expressing doubt that a woman will return to work full-time after having a baby do not constitute direct evidence of pregnancy discrimination." *Id.* (citing *Troupe*, 20 F.3d at 736).

Approximately sixteen years later, in *Hitchcock v. Angel Corps, Inc.*, the Seventh Circuit held that a supervisor asking if an employee was quitting due to her pregnancy and recommending that another employee get an abortion to avoid attendance problems "are at least *circumstantial* evidence of pregnancy discrimination, because they can be a manifestation of precisely the kind of prejudiced belief that the Pregnancy Discrimination Act was designed to combat—

14

the stereotype that women, particularly mothers, belong in the home." 718 F.3d 733, 741 (7th Cir. 2013). *Hitchcock* distinguished *Ilhardt* (and by extension, *Troupe*) as cases holding only that stereotype-rooted statements "do not constitute *direct* evidence of pregnancy discrimination" and ultimately reversed the lower court's grant of summary judgment in defendant's favor. *Id.* However, the plaintiff in *Hitchcock* provided a holistic set of facts from which a reasonable jury could draw an inference of discrimination, including that her work responsibilities significantly increased right after announcing her pregnancy and conflicting proffered rationales for her termination. *Id.* at 738, 741–42; *see also Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1045 (7th Cir. 1999) (affirming denial of summary judgment on Pregnancy Discrimination Act claim based on evidence that included repeated comments from plaintiff's supervisor disparaging her pregnancy as well as evidence that the only other employee fired was also a pregnant woman); *Altwasser v. Am.'s Auto Body, Inc.*, No. 21-CV-2524, 2024 WL 1798778, at *9 n.9 (N.D. Ill. Apr. 25, 2024) (denying motion for summary judgment on Title VII pregnancy discrimination claim because employer "did not merely express doubt about whether [plaintiff] would return to work after giving birth; instead, he repeatedly tried to discourage her from doing so and pointed to the benefits that he saw for her life if she stayed home with her baby.").

To the extent that *Troupe, Ilhardt*, and *Hitchcock* reached different outcomes based on their treatment of evidence as "direct" versus "circumstantial," the Court remains mindful of *Ortiz*'s reminder that "all evidence belongs in a single pile and must be evaluated as a whole." 834 F.3d at 766. The Court asks only whether Hines's

15

statement to Anderson "would permit a reasonable factfinder to conclude" that Amazon discharged Ivy because of her recent pregnancy and childbirth. *Id.* at 765. It concludes that it does not.

On its face, Hines's comment is neutral to Ivy's sex and postpartum status and concerns Hines's belief that, after Ivy took advantage of Amazon's employee benefits, she would pursue another employment opportunity. Hines never said that she expected Ivy not to return to work because that is what Hines would expect a woman to do after giving birth. Outwardly, Hines's sentiment could apply equally to an employee who leaves an employer shortly after taking advantage of a different kind of benefit, such as tuition reimbursement or student-loan forgiveness. In this light, Hines's statement is no different from the one at issue in *Troupe*: a representative of the employer cites doubt about the employee's return from maternity leave as a reason for firing her. *Troupe*, 20 F.3d at 736. Hines's statement is less egregious than those made in *Ilhardt*, and *Hitchcock* cited and distinguished *Ilhardt* as holding that offensive comments of this nature do not constitute direct evidence of sex discrimination but can be circumstantial evidence that can support a finding of discrimination when considered as part of a larger body of evidence. 718 F.3d at 741–42.

It is possible to look past the facial meaning of Hines's alleged statement and find that it reflects a stereotypical belief about women who become mothers. *See Sheehan*, 173 F.3d at 1045 (a reasonable jury is not "required to accept a proffered innocent construction of the remarks"). "A single 'bit' or 'piece' of evidence, however,

16

is not enough to support a claim of discrimination." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 885 (7th Cir. 2016). An employer's facially neutral but arguably stereotypical motivation for terminating an employee is not sufficient to prove discriminatory intent; a plaintiff needs additional evidence to support the stereotypical inference. *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 791 (7th Cir. 2015) (comments that a rejected Black applicant was a "bad actor," was not on his "best behavior," and would be a "better fit" elsewhere could not, without more, allow an inference of discrimination); *see also Pearson v. Advoc. Health Care*, 727 F. App'x 866, 869 (7th Cir. 2018) (plaintiff's argument that "ignorant" was a coded racial epithet failed without evidence that the speaker shared her understanding of the word).

Ivy does not offer any other evidence that tends to show that her sex was Hines's true reason for terminating her. On the contrary, the record contains evidence that Hines did *not* harbor the stereotype that women are no longer suitable for the workforce upon becoming mothers. Once Ivy's leave elapsed, Hines contacted her multiple times after she did not come back to work encouraging her to provide the documentation required to extend her leave. [50] ¶¶ 55–57; [57] ¶¶ 55–57. *Contra Hitchcock*, 718 F.3d at 738, 742 (overturning summary judgment on Title VII sex discrimination where there were multiple pieces of evidence pointing towards pregnancy discrimination—such as higher-ups offering conflicting and shifting rationales for firing the pregnant employee and a substantial increase in her workload—in addition to a supervisor's asking if she was quitting because of her

17

pregnancy); *contra Joll*, 953 F.3d at 930 (overturning summary judgment on Title VII sex discrimination where a female job applicant was asked interview questions about her parenting duties, her references were contacted earlier than other applicants', hiring managers used inconsistent criteria for hiring two male applicants over her, and one hiring manager criticized her as having a dominant personality). Hines's single statement falls short.

Taking the evidence as a whole, even in the light most favorable to Ivy, a reasonable factfinder could not conclude that Hines terminated Ivy for a discriminatory motive. The Court therefore grants summary judgment on Ivy's discrimination claim.

### C.    Title VII Harassment (Count II)

Ivy does not respond to defendant's argument in favor of granting summary judgment on the count of harassment and indeed excludes Count II from her assertion that "Amazon's motion for summary judgment should be denied as to Counts I, III, IV, and V." [60] at 2, 12. Ivy also has not identified any offensive remarks that could constitute harassment; when asked, she testified that she did not remember taking offense at comments her coworkers made about her pregnancy, including questions about her due date and the sex of her baby. [50-5] at 95:21–96:24. The Court therefore finds that she has forfeited her harassment claim. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 374 n.2 (7th Cir. 2020) (citation omitted).

### D.    Title VII Retaliation (Count III)

Ivy claims that Amazon retaliated against her in violation of Title VII. "Pleading a retaliation claim under Title VII requires the plaintiff to 'allege that she

18

engaged in statutorily protected activity and was subjected to an adverse employment action as a result.'" *Carlson v. CSX Transp., Inc.*, 758 F. 3d 819, 828 (7th Cir. 2014) (quoting *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1029 (7th Cir. 2013)). Under Title VII, "'[p]rotected activity' is 'some step in opposition to a form of discrimination that the statute prohibits.'" *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011)). That "step" must be a complaint about unlawful discrimination, or another action or expression that opposes discrimination. *Huang*, 754 F.3d at 451.

Ivy never voiced such a complaint, either to a supervisor at Amazon or to the EEOC or other government body, and she does not identify another action that may arguably constitute a step against discrimination. Requesting and taking maternity leave is not a protected activity under Title VII, *contra* [60] at 8; only speaking or acting against discrimination can satisfy the requirement.[7] Summary judgment is therefore proper as to Title VII retaliation.

### E.    PWFA Failure to Accommodate (Count IV)

Ivy also asserts that Amazon failed to accommodate her pregnancy- or childbirth-related condition as required by the Pregnant Worker Fairness Act

---

[7] Ivy cites *Willis v. Career Educ. Corp.*, No. 12 C 07662, 2015 WL 3859191 (N.D. Ill. June 19, 2015) to support her assertion that taking maternity leave was a protected activity. [60] at 8. But *Willis* identifies a request for leave as protected activity under the FMLA, not Title VII. 2015 WL 3859191 at *8. It is not persuasive here.

19

("PWFA"), which took effect in 2023. The PWFA requires that covered employers[8] accommodate workers' conditions related to pregnancy, childbirth, or related medical conditions, unless the accommodation imposes an undue hardship on the business. 42 U.S.C. § 2000gg-1(1). Congress largely modeled the PWFA on the Americans with Disabilities Act ("ADA"), and the PWFA directly invokes the ADA concept of employing an interactive process to determine appropriate accommodation. 42 U.S.C. § 2000gg(7). The question here is whether Ivy participated in the interactive process such that Amazon could be held liable by a reasonable jury for failing to accommodate her condition.

Under the ADA and now the PWFA, individuals seeking accommodation must participate in an interactive process along with their employer to determine the appropriate accommodation. *Id.*; *see also E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005). In the ADA context, "when an employer takes an active, good-faith role in the interactive process, it will not be liable if the employee refuses to participate or withholds essential information." *Sears*, 417 F.3d at 805. As part of the interactive process, the employer may require medical documentation corroborating the employee's condition and its relation to pregnancy, childbirth, or a related condition. 29 C.F.R. § 1636.3(l)(1)–(2); *see also Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009) (an employee must provide medical

---

[8] The parties do not dispute that Amazon is a covered employer as a business with at least 15 employees. 42 U.S.C. § 2000gg(2)(B)(i).

20

evidence of her condition, such as a doctor's note, before an employer is required to provide an accommodation under the ADA).

Ivy did not provide documentation of her health condition, even when Amazon requested such documentation multiple times both over email and by phone. She only provided confirmation that she had been pregnant and that her son was born on December 1, but that information does not hint at a continuing medical need extending months beyond her delivery. While Ivy said that she was "high-risk" according to doctors, Amazon was not required to take her word for it. 29 C.F.R. 1636.3(l)(1)–(2); *Rowlands v. United Parcel Serv. – Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (employers are entitled to request a doctor's note verifying the employee's condition as part of the ADA interactive process).

Ivy argues that the documentation Amazon requested was more onerous than the PWFA allows: the PWFA limits documentation to the minimum sufficient to establish the physical or mental condition, establish its relation to pregnancy or childbirth, and describe the accommodation the condition necessitates. *See* 29 C.F.R. 1636.3(l)(2)(i). A reasonable jury may agree that Amazon's documentation request, which asked for a treatment plan, went beyond what the PWFA allows. [50-27] at 2. But it could not agree that Ivy held up her end of the process. She failed to provide any documentation relating to her postpartum health condition, or even any description of her condition beyond the vaguest suggestion. Ivy also did not request more time to gather documents, push back on the breadth of Amazon's request, or express confusion about what Amazon asked of her. Rather, she indicated that she

21

would comply with the documentation request and then simply provided, once again, a confirmation of her pregnancy and of her son's birth date. Neither document affirmed or even suggested a medical condition that would preclude her return to work at ten weeks postpartum.

Ivy also contends that Amazon's erroneous inclusion of a March 13 deadline in addition to its intended February 27 deadline shows a lack of good-faith effort to engage. [60] at 10. As the Court has already said, the record does not show that Ivy relied upon the March 13 date, and she affirmed receipt of the February 27 deadline. [50-5] at 92:1–5. She also has not shown that she would have engaged in the interactive process with the benefit of additional time. Amazon contacted Ivy, and she did not respond with evidence of her condition. There is no evidence that the date error prejudiced her in the process.

Finally, Ivy argues that Hines granted UPT to nonpregnant coworkers without requiring documentation. The PWFA prohibits employers from requiring documentation for requested accommodations that are available without documentation to employees not covered under the PWFA. 29 C.F.R. 1636.3(l)(1)(v). But in this case, and as already discussed, the accommodation Ivy sought and the one granted to her colleagues are not the same. Ivy requested two additional weeks of leave tacked onto a twelve-week paid leave that she had already taken. That accommodation is not similar to employees being excused from a few hours or a single shift. [50] ¶ 74; [57] ¶ 74.

Amazon requested medical confirmation in writing and by phone on multiple occasions, and *Ivy* dropped her end of the rope. Construing the record in the light most favorable to Ivy, a reasonable jury could not hold Amazon liable for failure to accommodate her pregnancy-related condition because Ivy did not engage in the interactive process.

### F.      PWFA Retaliation (Count V)

Finally, Ivy asserts a claim that Amazon retaliated against her for taking maternity leave in contravention of the PWFA. The PWFA makes it illegal for covered employers to "take adverse action in terms, conditions, or privileges of employment against a qualified employee on account of the employee requesting or using a reasonable accommodation to the known limitations related to the pregnancy, childbirth, or related medical conditions of the employee." 42 U.S.C. § 2000gg-1(5). For Ivy to demonstrate retaliation under the PWFA, the evidence must be sufficient to allow a reasonable jury to find that (1) she used or requested a reasonable accommodation for a limitation related to pregnancy, childbirth, or related medical conditions, (2) Amazon took an adverse action against her, and (3) there is a causal connection between the two. *Id.*; *Keiper v. CNN Am., Inc.*, Case No. 24-CV-875, 2024 WL 5119353 at *5 (E.D. Wis. Dec. 16, 2024).

The first two elements are clear: Ivy took leave before and after the birth of her child, and Amazon subsequently discharged her. The issue, then, is whether Ivy can show that Amazon discharged her *because* of her pre- and postnatal leave. Many types of evidence can support an inference of causation in a retaliation claim, but a direct, unambiguous statement of motive will suffice. *Coleman v. Donahoe*, 667 F.3d 835,

23

860 (7th Cir. 2012). Courts have noted that such an admission is uncommon,[9] but Ivy alleges that Hines made one when stating to Anderson that "she had terminated Ms. Ivy because she thought Ms. Ivy was just there for the maternity benefits and was going to leave afterward." [61-7] ¶ 7.

The Court found above that Hines's alleged statement to Anderson was not sufficient to imply sex discrimination. The statement could suffice, though, to prove retaliation under the PWFA and it thus defeats summary judgment on this claim. "Evidence, though not conclusive, that the cause was retaliation should be enough to entitle the plaintiff to a jury trial." *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 643 (7th Cir. 2002). While it was not *discriminatory* under Title VII for Hines to fire Ivy solely based on Hines's assessment of Ivy's likelihood to return to work, that motivation is illegal under the PWFA, which grants childbirth-related leave protected status.

Amazon argues that the Court should not consider this statement because it is hearsay. Amazon does not acknowledge that a statement offered against an opposing party which was made by a representative of that party is not hearsay. Fed. R. Evid. 801(d)(2)(A). The out-of-court nature of the alleged statement raises an issue of credibility for a jury to resolve. But whether Hines actually made such a statement

---

[9] *See, e.g., Perry v. Bath & Body Works, LLC*, 993 F. Supp. 2d 883, 900 (N.D. Ind. 2014) ("The Seventh Circuit has noted that 'admissions of illegal discrimination and retaliation are rare' such that it is 'not surprising [when a plaintiff] has not presented a 'smoking gun' confession by [the defendant].'") (quoting *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013)).

24

to Anderson or not is disputed, and it is up to a jury to decide whose version of the story it believes. The retaliation claim under PWFA therefore survives.

## IV.    Conclusion

Defendant's motion for summary judgment [49] is granted as to Plaintiff's Title VII claims and her PWFA failure-to-accommodate claim. Defendant's motion is denied as to the PWFA retaliation claim. The parties are directed to promptly meet and confer on a potential trial date and the possibility of settlement. The Court sets a status hearing on 5/14/2026 at 9:30 a.m. to discuss these two options.

ENTER:

_____
Georgia N. Alexakis
United States District Judge

Date: 4/30/2026